IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| David Atkins, </br>     Plaintiff, | ) </br> ) </br> ) |
| v. | )      1:18cv354 (LMB/TCB) </br> ) |
| Lt. Glaser, et al., </br>     Defendants. | ) </br> ) </br> ) |

<u>MEMORANDUM OPINION</u>

On September 27, 2019, this Court granted a Motion for Summary Judgment ("Motion") [Dkt. No. 25] filed by defendants Thomas Glaser ("Glaser" or "defendant Glaser"), Erica Williams ("Williams" or "defendant Williams"), and Robert Cleek ("Cleek" or "defendant Cleek") (collectively "defendants"). The United States Court of Appeals for the Fourth Circuit has vacated that decision and remanded this civil action for reevaluation of defendants' Motion. [Dkt. No. 62]. On remand, the Fourth Circuit has instructed this Court to consider plaintiff David Atkins's ("plaintiff" or "Atkins") verified complaint when deciding defendants' Motion. Id. at 4. The Court has reexamined the summary judgment record—including the verified complaint, the exhibits that accompanied it, and materials submitted by plaintiff in support of a Motion to Alter Judgment[1]—and finds that defendants Glaser, Williams, and Cleek are entitled to judgment in their favor.

---

[1] The Court declined to consider the materials attached to the Motion to Alter Judgment when plaintiff filed them because they did not contain previously unavailable new evidence and the motion was viewed as an attempt "to relitigate old matters." [Dkt. No. 50]. As the Court now freshly evaluates the defendants' Motion, it is appropriate to consider not only the verified complaint but also the other sworn statements that the plaintiff submitted regarding defendants' Motion.

## I. Procedural History and Scope of Remand

Plaintiff's complaint named six defendants, raised multiple claims, and sought $6 million in damages and the removal of defendants from their jobs. [See Dkt. No. 1]. One defendant, "A. Turner" was never served and was dismissed pursuant to Fed. R. Civ. P. 4(m). [Dkt. No. 41]. On February 5, 2019, this civil action was dismissed with prejudice as to the "claims regarding lost property and denial of pain medication" and as to all claims against defendants Nurse Samboy and Sheriff Baron. [Dkt. No. 22]. Defendants' motion to dismiss was denied without prejudice "as to the remaining claims of excessive force and deliberate indifference." Id.

The three remaining defendants—Glaser, Cleek, and Williams—then moved for summary judgment on the two remaining claims. [Dkt. No. 25]. Defendants Glaser and Cleek sought judgment on plaintiff's claim of deliberate indifference, which is based on plaintiff's allegations that the defendants deprived him of adequate nourishment, causing him to black out from a hypoglycemic seizure and injure his elbow. [Dkt. No. 26]. Defendant Williams moved for summary judgment on plaintiff's excessive force claim. Id. Defendants gave plaintiff the notice required by Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), informing him of the deadline for filing a response and the requirement that he offer sworn statements to set forth his version of the facts, and warning plaintiff that the civil action could be dismissed "on the basis of the moving party's papers if you do not file a response." [Dkt. No. 27].

Plaintiff filed two unsworn documents in response to defendants' Motion [Dkt. Nos. 34 and 36], in which he repeated his requests for $6 million in compensatory damages and the removal of defendants from their positions and he added a request for $15 million in punitive

2

damages.² [Dkt. No. 36] at 3-4. Because plaintiff's opposition was unsworn, it was not considered by the Court. [Dkt. No. 40] at fn 3 (citing Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) (explaining that "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment")). Instead, the Court based its findings of undisputed material facts on the affidavits submitted by defendants in support of their Motion, erroneously stating that plaintiff's complaint was "unsworn and unauthenticated," [Dkt. No. 40] at fn 3, and granted summary judgment in defendants' favor.

Plaintiff appealed. The Fourth Circuit vacated the order granting summary judgment to defendants Glaser, Cleek, and Williams on plaintiff's claims of deliberate indifference and excessive force "[b]ecause the district court based its decision to grant summary judgment in favor of Defendants solely on the evidence presented by Defendants." The civil action was "remand[ed] to allow the district court to also consider Atkins's verified complaint in determining whether Defendants are entitled to summary judgment." [Dkt. No. 62] at 4.

## II. Discussion

A. Plaintiff's Evidence

Plaintiff's verified complaint and his two affidavits in support of his Motion to Alter Judgment do not include any evidence that creates a dispute regarding the material facts on which the September 27, 2019 judgment was entered for defendants. Instead, plaintiff's sworn statements address issues that are not material to the outcome of defendants' Motion,³ offer

---

² The amount of damages plaintiff seeks is irrational and suggests that his motion is fanciful. See Anderson v. Pollard, No. 3:20-cv-489, 2020 WL 9349174, at *2 (E.D. Va. 2020) (dismissing a complaint as frivolous partly on the basis of plaintiff seeking $75,000,000.00 in damages).

³ Much of plaintiff's complaint and affidavits focus on establishing his diagnosis of hypoglycemia and history of hypoglycemic seizures and denying a diagnosis of epilepsy. Complaint, [Dkt. No. 1] at 6, 13 and Exs. A and B to Complaint; Motion to Alter Judgment, [Dkt. No. 43] at 2-4; Memorandum of Undisputed Facts, [Dkt. No. 44] at 2-4 (stating that

3

merely conclusory statements, and make inconsistent statements regarding the alleged facts of plaintiff's excessive force claim, making these averments unreliable. Cf. Kinser v. United Methodist Agency for the Retarded--W. N. Carolina, Inc., 613 F. App'x 209, 210 (4th Cir. 2015) (upholding district court's decision to strike affidavits submitted on summary judgment where the affidavits conflicted with affiant's prior deposition testimony); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.")

B. Undisputed Material Facts

Plaintiff arrived at Norfolk City Jail ("NCJ") on October 10, 2017. In accordance with institutional protocol, plaintiff immediately underwent classification and a medical screening. Plaintiff's NCJ Patient Profile reflected diagnoses of hypoglycemia and seizures/epilepsy. [Dkt. No. 26] at ¶ 3. Plaintiff claims that the diagnosis of epilepsy was false; however, whether a NCJ employee incorrectly noted that plaintiff had epilepsy is not material to defendants' Motion.

At approximately 5:00 a.m. on October 21, 2017, plaintiff was provided breakfast. He offers no evidence that the breakfast was inadequate. Between 10:30 and 11:00 a.m., he and other inmates in housing unit DMX2 were scheduled to receive lunch. After accepting his tray, plaintiff informed a jail official that he had found a large bug in his beef stew and requested a

---

plaintiff has hypoglycemia, that defendants were aware of his diagnosis, that Nurse Samboy— who has been dismissed from this civil action—falsely entered a diagnosis of epilepsy in his records, and that the anti-seizure medication that was prescribed for him was unnecessary). The Complaint also provides plaintiff's account of how he found a bug in his food; however, the details of how the bug looked on the tray are not material to the resolution of defendants' Motion. Similarly, plaintiff's sworn statements also focus on his desire and inability to file a grievance form regarding the bug in his meal [Dkt. No. 1] at 7, 15, 17, 19, 21, conditions of confinement unrelated to the actions of defendants Glaser, Cleek, and Williams, and plaintiff's medical care after the events relevant to defendant's Motion.

4

grievance form to document the matter. [Dkt. No. 1] at 7, [Dkt. No. 26] at ¶ 8. In response to this incident, Glaser reported to the food service area, and both Glaser and Cleek offered plaintiff a new tray of food. [Dkt. No. 26] at ¶¶ 12-13. Plaintiff refused the offer, arguing that the entire batch of stew was contaminated. There is no evidence in the record of any other inmates complaining of a bug in their food; however, hearing plaintiff's protests, other inmates also refused to eat their food. As a result, a total of forty-nine lunch trays were returned or refused by inmates. [Dkt. No. 26] at ¶ 14.

Glaser conducted a brief investigation into how an insect could have gotten into plaintiff's food. After speaking with another inmate as well as several employees of the food service company, Glaser concluded that it was unlikely the bug got into plaintiff's food while it was being prepared. [Dkt. No. 26] at ¶¶ 16-19. Plaintiff describes a more limited investigation, stating the Glaser spoke with plaintiff and one other inmate and that then "Lt. Glaser investigation was done." [Dkt. No.1] at 7. Plaintiff's description of the facts surrounding his lunch tray and Glaser's investigation do not create a dispute of material fact. Plaintiff was not in a position to observe much of Glaser's investigation and his conclusory statement that the investigation was "done" does not create a conflict regarding the details of Glaser's investigation.

After Glaser explained the results of the investigation and his conclusion to plaintiff, he again offered plaintiff a fresh tray. Plaintiff again refused. [Dkt. No. 26] at ¶ 20. Plaintiff's sworn statements do not contest that defendants twice offered him a fresh tray of food while he was in DMX 2.

It is undisputed that plaintiff declared that he and the other inmates would accept bagged lunches instead of the trays of hot food that had been prepared for lunch that day. [Dkt. No. 26]

5

at ¶ 21. The request for bagged lunches was denied because, as Glaser and Cleek explain in their affidavits, bagged lunches are provided for inmates who are travelling during mealtime and are not intended as an optional replacement for the hot meals served to inmates. [Dkt. No. 26-2] at ¶ 11; [Dkt. No. 26-4] at ¶ 9. In Glaser and Cleek's experience, some inmates prefer bagged lunches because they attempt to barter the packaged foods with other inmates for various services or contraband. [Dkt. No. 26] at ¶ 24. Because Atkins was creating a problem and causing other inmates to refuse their meals, Glaser informed Atkins that he would receive "a violation" for interfering with staff duties and that he would be transferred to a different housing unit while prison officials addressed the other inmates regarding the quality of the food and the results of Glaser's investigation regarding the bug. [Dkt. No. 26] at ¶ 26. After speaking with Glaser and Cleek, the other inmates eventually agreed to eat the stew; however, because the food had been sitting out for an extended period of time, the kitchen staff were ordered to prepare new, hot trays. [Dkt. No. 26] at ¶ 27.

Glaser summoned defendant Williams to transport Atkins from Housing Unit DMX2 to Section 1A. Corporal Paul Brown ("Brown"), whom plaintiff did not name as a defendant, assisted Williams in escorting Atkins. According to Williams's and Brown's affidavits, during the trip to Section 1A, Atkins continually tried to turn around toward Williams and Brown to complain about being relocated. [Dkt. No. 26] at ¶ 33. Plaintiff acknowledges in his complaint that he spoke to Williams and challenged the basis of his transport by asking: "[w]hy was I being moved??? When there was no conflict between me and another inmate, there was no security issues. I simpl[y] reported a big bug on my tray in my food." [Dkt. No. 1] at 11.

For staff and inmate safety, NCJ policy and procedure require inmates to face straight ahead and not speak with the escorting officers while the prisoner is being moved to another

location. [Dkt. No. 26] at ¶ 32. Accordingly, Williams repeatedly directed plaintiff to turn away from her and to stop speaking. Williams explains that when plaintiff did not comply with her directions, she placed her hand on plaintiff's back to direct him to turn around and face the wall while they were waiting for the elevator. [Dkt. No. 26-5] at ¶¶ 7. Brown also submitted an affidavit which corroborated Williams's description of the events. [Dkt. No. 26-6].

Plaintiff offers two inconsistent accounts of his transport to Section 1A. First, in his complaint, he claims that Williams "started trying to push [his] face into the walls" while they waited for the elevator and, once in the elevator Williams "continued to try to put [his] face th[r]ough the wall" because he asked "[w]hy was I being moved???" [Dkt. No. 1] at 10-11. In contrast to his verified complaint, in which he admits to talking, plaintiff swears in his Motion to Alter Judgment that he "said nothing [and] did nothing" during the transport. [Dkt. No. 34] at 5. This inconsistency between plaintiff's two sworn statements regarding his conduct during his transfer to Section 1A make both statements unreliable, and they are not sufficient to outweigh the sworn affidavits of Williams and Brown.

In addition, plaintiff's Motion to Alter Judgment states, for the first time, that Brown "tried to pick [him] up by the back of [his] jumper, causing [him] to fall forward with handcuffs on & hand[s] behind [his] back." Id. Because Brown is not a defendant, plaintiff's assertions regarding Brown's conduct do not defeat defendants' Motion. Moreover, the assertions against Brown cast further doubt on the validity of plaintiff's affidavit as a whole because there is no credible explanation why plaintiff neither included these alleged facts in his complaint nor named Brown among the numerous defendants. In addition, despite plaintiff's claim that Williams and Brown used force against him, including the claim that he fell forward while his hands were restrained behind his back, there is no evidence in the record that Atkins suffered any

7

injury as a result of his transport. Given that he was examined at the hospital only a few hours after his transport to Section 1A, the lack of any evidence of bruising to plaintiff's face or back is significant. It is also significant given the number of grievance forms plaintiff has submitted that he did not file a grievance about either Williams or Brown using excessive force during his transfer. [Dkt. No. 26] at ¶ 39.

After Atkins was placed in Section 1A, Glaser visited him. Atkins asked Glaser for a lunch tray, and Glaser responded that he would be given one after the kitchen finished preparing fresh food. Atkins then clarified that he was requesting a different lunch and that he did not want beef stew. Glaser replied that beef stew was the only option for lunch that day and again asked whether Atkins wanted a new tray. Atkins took the position that he was not refusing lunch in general, but he was refusing the beef stew that was being offered to him. Glaser asked again whether Atkins wanted a new tray of beef stew, and Atkins again declined. As a result, Glaser documented that Atkins refused lunch. [Dkt. No. 26] at ¶¶ 41-44. Plaintiff's sworn statements do not create a dispute about these facts. For example, in the two affidavits that plaintiff filed after summary judgment was entered for defendants, he did not deny that Glaser twice offered him a new tray of beef stew while he was in Section 1A. Although Atkins states that defendants "refused to feed me" [Dkt. No. 43] at 4, and "denied me lunch" [Dkt. No. 44] at 4, while he was in Section 1A, these statements must be read within the context of Atkins's demand for a special meal and his refusal of the beef stew that was offered to him multiple times.

Shortly after Glaser's visit, Atkins informed Deputy Ashley Turner that he had just suffered a seizure. Plaintiff was transported to Sentara Norfolk General Hospital complaining of elbow pain, which he alleges resulted from striking his arm on the floor during the seizure. At the hospital, Atkins informed Dr. Ryan Tomberg that he had a seizure due to hypoglycemia.

Tomberg ordered a glucose screen, the results of which showed that plaintiff's blood glucose levels were within normal limits at the time of the test. [Dkt. No. 26] at ¶¶ 57 and 58. There is nothing in the record indicating whether plaintiff had anything to eat between his fall and the examination at the hospital. An x-ray examination of plaintiff's elbow revealed some mild soft tissue swelling, but no acute pathology. [Dkt. No. 26-3] at 53. Dr. Tomberg diagnosed plaintiff with left elbow arthralgia and a "chipped osteophyte" in his left elbow. [Dkt. No. 26-3] at 18.[4]

The next day, October 22, 2017, Glaser issued plaintiff a "Cost Recovery Form" indicating that plaintiff was being held responsible for the forty-nine wasted lunches, which resulted from the issue he made about a bug in his food. Plaintiff signed the form, acknowledging that $36.75—a cost of seventy-five cents per meal—would be deducted from his inmate trust account. Glaser also charged plaintiff with a violation of "Code 0202" for interfering with staff duties. Plaintiff was later found guilty of that disciplinary charge.

### III. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of law, the nonmoving party "must show that there is a genuine dispute of material fact for trial …

---

[4] The Cleveland Clinic defines an "osteophyte" as a "bone spur," or "a smooth, bony lump that grows off a bone." See Bone Spurs (Osteophytes), https://my.clevelandclinic.org/health/diseases/10395-bone-spurs-osteophytes (last accessed March 16, 2022).

9

by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## IV. Analysis

A. Deliberate Indifference Claim Against Glaser and Cleek

Plaintiff alleges that defendants Glaser and Cleek were deliberately indifferent to his medical needs because they failed to provide him with lunch on October 21, 2017, causing him to suffer a hypoglycemia-induced seizure and fall, resulting in an injury to his elbow. [See Dkt. No. 1].

To succeed on a deliberate indifference claim under the Eighth or Fourteenth Amendments,[5] a plaintiff must establish that the defendant was deliberately indifferent to the plaintiff's serious needs. See Knight v. Watts, No. ELH-21-56, 2022 WL 80637, at *11 (D. Md. Jan. 6, 2022) (observing that "the Eighth Amendment deliberate indifference standard applies to Fourteenth Amendment claims by pretrial detainees of inadequate medical treatment ... [and] conditions of confinement claims") (citing Hill v. Nicodemus, 979 F.2d 987, 991-92 (4th Cir. 1992); Seth v. McDonough, 461 F. Supp. 3d 242, 259 (D. Md. 2020)). Accordingly, to succeed as to this claim, plaintiff must show (1) an objectively serious deprivation of a basic human need—one causing serious physical or emotional injury, and (2) that prison officials were deliberately indifferent to that need. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

---

[5] Because the record does not make clear whether plaintiff was a pretrial detainee or convicted prisoner at the time of the events in question, the Court cannot determine which amendment would apply.

10

Only extreme deprivations will satisfy the first prong of this test. The plaintiff has the burden of showing that the risk from the conditions of his confinement was so grave that it violated contemporary notions of decency and resulted in serious or significant physical or emotional injury. Hudson v. McMillian, 503 U.S. 1, 8 (1992). To meet the second prong, a plaintiff must show that defendants knew of circumstances from which an inference could be drawn that a "substantial risk of serious harm" was posed to plaintiff's health and safety, that they drew that inference, and that they then disregarded the risk. Farmer, 511 U.S. at 837.

The conditions of which plaintiff complains do not amount to a sufficiently serious deprivation such that the protections of the Eighth or Fourteenth Amendments apply. First, the existence of a bug in plaintiff's food does not, standing alone, represent a serious deprivation of a basic human need. See Belfield v. Stolle, No. 3:13cv234, 2015 WL 1526212, at *3 (E.D. Va. Apr. 3, 2015) (finding that a plaintiff who alleged that his food trays "arrive[d] [w]ith bugs on the trays from the kitchen every morning" failed to state an Eighth Amendment claim upon which relief could be granted). Nor does a temporary deprivation of food amount to a constitutional violation. See McGivery v. Mathena, No. 7:14cv57, 2014 WL 2967622, at *2 (W.D. Va. July 1, 2014) ("occasional, short-lived problems with prison food service and isolated instances of inmates missing a meal or two do not implicate the Eighth Amendment").[6]

---

[6] Withholding food from inmates with certain medical needs can constitute a serious deprivation for the purposes of the Eighth Amendment. See, e.g. Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (reversing dismissal of Eighth Amendment claim based on alleged failure of prison officials to provide diabetic inmate special foods). As explained elsewhere in this opinion, however, the evidence before the Court clearly shows that defendants did not deny plaintiff food. Rather, they repeatedly offered plaintiff a new lunch tray, which he rejected. Based on this record, it was plaintiff's conduct of rejecting the food that was offered, and not the conduct of the defendants, that caused him to miss a meal.

11

Moreover, even if the existence of insects in meals or a temporary deprivation of food to an inmate with a history of hypoglycemia were sufficiently serious deprivations, and even assuming defendants Glaser and Cleek were aware of plaintiff's medical status,[7] the uncontested facts show that these defendants were not indifferent to the plaintiff's needs. The record shows that plaintiff was repeatedly offered replacement meals both before and after a fresh batch of beef stew had been prepared. On each occasion, plaintiff rejected the beef stew. There is no dispute as to these facts. That defendants Glaser and Cleek declined to provide the bag lunch that plaintiff requested does not amount to a deprivation of food. Cf. DuPont v. Skrah, No. 1:16-cv-159-SB, 2017 WL 1160584, at *3 (D. Or. Jan. 30, 2017) (stating that an inmate "is not entitled to his choice of meals while incarcerated" and finding that the denial of vegetarian meals to inmates without "a documented religious or medical need" was not violative of the Eighth Amendment). Defendants Glaser and Cleek are therefore entitled to judgment as a matter of law, and their Motion for Summary Judgment will be granted as to this claim.[8]

B. Excessive Force Claim Against Williams

A district court assessing a claim of excessive force must take a holistic approach and inquire whether "the [defendant] officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them." Lombardo v. City of St. Louis, Mo., 141 S. Ct. 2239, 2241 (2021)[9] (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)) (internal quotations

---

[7] Glaser and Cleek both deny that they were aware of plaintiff's medical history, see [Dkt. No. 26-2] at 4; [Dkt. No. 26-4] at 3-4, a point plaintiff contests, see [Dkt. No. 43] at 3.

[8] Defendants also argue that any elbow injury plaintiff suffered was not sufficiently serious to trigger constitutional protections. See [Dkt. No. 26] at 16. Because plaintiff does not allege that defendants acted indifferently toward his elbow injury, the Court need not consider that issue.

[9] In Lombardo, the Supreme Court clarified that this standard applies in all excessive force cases, regardless of the specific source of legal protection. See Lombardo, 141 S. Ct at 2241, n.2 ("We need not address whether the Fourth or Fourteenth Amendment provides the proper basis for a

omitted). Relevant factors include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015).

Williams's use of force during the transfer of Atkins to Section 1A was objectively reasonable. The uncontested facts show that Atkins repeatedly turned and spoke to Williams and Brown, in violation of a rule that is designed to protect the safety of the correctional officers and the inmates and, as a result, Williams "briefly put her hand on Atkins's back to direct him to turn around and face the wall." [Dkt. No. 26] at 35. This brief contact was an objectively reasonable effort to encourage Atkins's compliance with the rules.

Although a district court's inquiry should examine "the nature of the force rather than the extent of the injury," Wilkins v. Gaddy, 559 U.S. 34, 34 (2010), it is equally true that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the [Constitution]." Graham v. Connor, 490 U.S. 386, 396 (1989). Consistent with this logic, "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." Wilkins, 559 U.S. at 37-38; Hudson, 503 U.S. at 9 (stating that not "every malevolent touch by a prison guard gives rise to a federal cause of action").

---

claim of excessive force against a pretrial detainee in Gilbert's position. Whatever the source of law, in analyzing an excessive force claim, a court must determine whether the force was objectively unreasonable in light of the "facts and circumstances of each particular case.") (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397) (internal quotations omitted).

13

Here, it is undisputed that plaintiff suffered no injury as a result of Williams's alleged actions. Indeed, there is no evidence in this record that plaintiff filed any complaint regarding Williams, and there is no mention of any alleged excessive force in the hospital records generated only hours after this incident. On this record, the Court concludes that there is no legitimate basis for plaintiff's excessive force claim.

Such a finding is consistent with decisions of both district courts and courts of appeals nationwide. See, e.g., Hanson v. Madison Cnty. Det. Ctr., 736 F. App'x 521, 531 (6th Cir. 2018) (holding that a defendant who shoved a plaintiff into a wall, resulting in no injury, did not act objectively unreasonably); Abdullah v. Tex., A-18-CA-1076-LY, 2019 WL 981942, at *5 (W.D. Tex. Feb. 27, 2019) ("A de minimis injury is sufficient to sustain a claim of excessive force only if it is the product of the malicious and sadistic use of force . . . . Plaintiff alleges no injury with respect to the use of pepper spray. Accordingly, Plaintiff has failed to allege a violation of his constitutional rights.") (citing Wilkins, 559 U.S. at 37-38 (2010)); Andrew v. St. Tammany Parish Prison, CA No. 15-2105, 2016 WL 447680, at *10-11 (E.D. La. Jan. 15, 2016) (finding no excessive use of force when "[t]he deputy's conduct was very brief and caused plaintiff no physical injuries").

## V. Conclusion

For the reasons stated above, even when taking plaintiff's verified complaint and other sworn statements into consideration, defendants are entitled to judgment in their favor. Consequently, defendants' Motion for Summary Judgment will be granted through an Order that will be entered alongside this Memorandum Opinion.

Entered this 11th day of April, 2022.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

14